UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Stefany Mogollon, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>- against -<br><br>Costco Wholesale Corporation,<br><br>Defendant | 1:21-cv-08361<br><br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1. Costco Wholesale Corporation ("defendant") manufactures, labels, markets, and sells Ground Himalayan Pink Salt, purporting to be sourced from "the heart of the Himalayan Mountains," under its Kirkland signature brand ("Product").



2.   The front label includes a colonial-era map of the Indian subcontinent, Sanskrit graphics, and the description, "Referred to as the purest salt in the world, Himalayan Pink Salt comes from the heart of the Himalayan Mountains. With hues of pink, red, and white, these vibrant colors are a sign of the salt's rich and varying mineral content," across a pink background.

### I.   MYSTIQUE OF HIMALAYAS

3.   A typical consumer is not aware of the geography of the Himalayas, which cover approximately 1,500 miles, beginning in Pakistan, and form an arc through northern India, Nepal, and Bhutan, before ending in China.



4.   The Himalayans are made up of three parallel ranges the Greater Himalayas, the Lesser Himalayas, and the Outer Himalayas.

5.   Himalaya is Sanskrit for "abode of snow," because this mountain range contains the most snow and ice, outside of Antarctica, due to its roughly 15,000 glaciers.

6.   The Himalayas contain more than 100 peaks exceeding 23,000 ft., including Mount Everest, the highest.

7. The climate range of the Himalayas is as broad as the mountains themselves, from tropical at the base to permanent ice and snow at the highest elevations.

8. From the eleventh century BC, Hindu ascetics, and Buddhist monks "told of holy sanctuaries amidst the secluded valleys, glacial rivers and hot springs," that, upon information and belief, produced life-invigorating salt, among other features.

9. The forbidding heights and natural beauty has attracted mountaineers and Western tourists, across religious and cultural barriers.[1]

10. The "values and ideals that continue to bring Western travelers to the Himalayas, especially those of wild nature, adventure and spirituality are shown to be consistent with media representations (e.g., films, guidebooks, travel literature) of the region, as part of the more general discourse of modernity and a 'mystical East.'"

11. Films including Seven Years in Tibet (1997) and Lost Horizon (1933) portray the Himalayan region as "a mysterious, spiritual land, lost in time and hidden from a destructive modern world, a frontier zone par excellence."[2]

12. Based in part on the rich traditions and culture of the Himalayans, salt from this region has gained popularity.

13. Reasons why pink salt from the Himalayas is valued include its restorative and nutrient properties are based in part on the unique geography of this region.

14. The pink color is based on high levels of iron.

15. The rivers that drain the Himalayas exhibit some of the highest sediment outputs in the world, including the Indus, Ganges, and Brahmaputra.

---

[1] Swami Sundaranand, The Himalayas through the Lens of a Sadhu, The Sunday Tribune, Jan. 13, 2002.
[2] Christopher Howard, "Horizons of possibilities: The telos of contemporary Himalayan travel." Literature & Aesthetics 22.1 (2014).

16. The natural harvesting process means pink salt from the Himalayas possesses up to 84 nutrients and minerals are not found in regular salt.

17. Moreover, the "heart of the Himalayas" is largely undeveloped and free from industrialization.

18. The result is salt with none of impurities that salt from other sources possess.

19. Pink salt obtained from the "heart of the Himalayas" is thus a valued item.

20. Products sold with presumed benefits of pink salt include lamps that may elevate one's mood, through emitting ions and air purifiers.

## II. CONSUMER DEMAND FOR AUTHENTICITY

21. Today's consumers are faced with increasing commercialization of products and seek brands that are genuine – whisky from Scotland, sake from Japan, and Italian tomatoes from Italy.

22. For many, authenticity has overtaken quality as the prevailing purchasing criterion.

23. Consumers will pay a price premium for what they perceive to be authentic products, particularly those perceived to be authentically associated with a specific place.

24. The reasons include (1) an expectation that a product made in the location where it was first developed will be higher quality than elsewhere due to production with original ingredients and methods and (2) a desire to support and maintain local traditions and cultures at the expense of large-scale production by international conglomerates.

## III. REPRESENTATIONS PRODUCT IS MADE IN MEXICO

25. Defendant's marketing and advertising of the Product gives consumers the impression it sourced from the Himalayans.

26. However, the Product is not from the "heart of the Himalayan Mountains," generally

considered the area of India which borders Tibet and Nepal, but from Khewra, Pakistan.[3]

27. The representation as from the "heart of the Himalayan Mountains" renders the labeling misleading because it expresses a geographical origin which is not true. 21 C.F.R. § 101.18(c) (incorporated by New York State).

28. The Product's origin is disclosed in the fine print on the side of the Product, where it states, "Salt is a Product of Pakistan."



29. While the Himalayan mountain range begins in Pakistan, the "heart of the Himalayan Mountains," are not in Pakistan, but in Kumaon, India.

30. Moreover, unlike traditional Himalayan pink salt, the Product lacks any mineral or nutrient content, as shown by the Nutrition Facts.



---

[3] Hadd, Diaa & Sattar, Abdul, *Pakistan Wants You To Know: Most Pink Himalayan Salt Doesn't Come From India*, National Public Radio, October 3, 2019; Liddle, Madhulika, *Into the Heart of the Himalayas - Book Review: Memory's Footprints*, The New Indian Express, April 19, 2020.

31. Pakistan has recently begun to prevent the misleading sale of pink rock salt as sourced from the Himalayans or India, in part to prevent consumer deception.[4]

## IV. CONCLUSION

32. Reasonable consumers must and do rely on a company to honestly identify and describe the origins, components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

33. By labeling the Product in this manner, Defendant gained an advantage against other companies, and against consumers seeking to purchase products that were smoked.

34. The value of the Product that plaintiff purchased was materially less than its value as represented by defendant.

35. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

36. Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

37. The Product is sold for a price premium compared to other similar products, no less than approximately $5.99 per 5 lbs., a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

38. Similar pink rock salt products which lack the representations associating them with the heart of the Himalayas cost considerably less, often no more than $3.49 per 5 lbs.

Jurisdiction and Venue

39. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

---

[4] Ali, Kabe, *Khewra Salt Set To Be Registered With International Trade Bodies*, Dawn Today's Paper, April 29, 2021

40. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

41. Plaintiff Stefany Mogollon is a citizen of Connecticut.

42. Defendant Costco Wholesale Corporation is a Washington corporation with a principal place of business in Issaquah, King County, Washington.

43. Plaintiff and defendant are citizens of different states.

44. Defendant transacts business within this district, through the marketing, supply, and sales of its products at numerous physical stores which it operates within this district.

45. Venue is in this district because plaintiff resides in this district and the actions giving rise to the claims occurred within this district.

46. Venue is in the of this District because a substantial part of the events or omissions giving rise to the claim occurred in New York County, i.e., Plaintiff's purchase of the Product at Defendant's store at 517 E 117th St New York, NY 10035. 28 U.S.C. § 1391(b)(2).

47. Plaintiff moved to Waterbury, Connecticut, in early 2021, but resided in New York County for approximately 15 years, right down the street from a Costco store.

Parties

48. Plaintiff Stefany Mogollon is a citizen of Waterbury, New Haven County, Connecticut.

49. For no less than 15 years, Plaintiff resided on East 117th St, New York, NY, right down the block from Defendant's store at 517 E 117th St New York, NY 10035.

50. In early 2021, like many New Yorkers, Plaintiff moved to the suburbs.

51. Defendant Costco Wholesale Corporation, is a Washington corporation with a principal place of business in Issaquah, Washington, King County.

7

52. Defendant operates close to six hundred warehouse stores in the United States.

53. Defendant's business model is based on an annual membership fee of $120.

54. By using the membership fee as a source of revenue, Defendant sells higher quality goods at lower prices than competitors, because it does not need to maximize profit on every item.

55. The Kirkland Signature brand is Defendant's private label brand.

56. While private label, or store brands, were once considered inferior to their national brand counterparts, this is no longer the case.

57. Through the internet, even non-members are able to purchase the Product by using grocery delivery services such as Instacart.

58. Plaintiff purchased the Product a Costco member or in another authorized capacity, on one or more occasions within the statutes of limitations for each cause of action alleged, at defendant's stores including the location at 517 E 117th St New York, NY 10035, between 2019 and 2021, among other times.

59. Plaintiff bought the Product because she expected it was from the heart of the Himalayan Mountains and had the properties associated with such a food because that is what the front label said.

60. Plaintiff bought the Product at or exceeding the above-referenced price.

61. Plaintiff relied on the representations identified here – the Indiana Jones-inspired map depicting Indian cities, the prominent description that it "comes from the heart of the Himalayan Mountains," and that it contained a "rich and varying mineral content," indicative of salt from this specific region.

62. Plaintiff expected the Product was sourced from the heart of the Himalayas, instead of Khewra, Pakistan, thousands of miles away from the snowy, mysterious peaks of Himalayas.

63. Plaintiff had no reason to know the Product was not from the heart of the Himalayas.

64. Plaintiff would not have purchased the Product if she knew the representations were false and misleading or would have paid less for it.

65. Plaintiff chose between Defendant's Product and other similar products which were represented similarly, but which did not misrepresent their attributes and/or lower-priced products which did not make the statements and claims made by Defendant.

66. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

67. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance that Product's representations are consistent with its composition.

## Class Allegations

68. Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of the following classes:

> **New York and Connecticut Class:** All persons in the States of New York and Connecticut who purchased the Product during the statutes of limitations for each cause of action alleged.

69. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

70. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

71. Plaintiff is an adequate representative because her interests do not conflict with other members.

72. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

73. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

74. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

75. Plaintiff seeks class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350

Connecticut Unfair Trade Practices Act (CUTPA) Sec. 42-
110a *et seq.*
(Consumer Protection Statute)

76. Plaintiff incorporates by reference all preceding paragraphs.

77. Plaintiff and class members desired to purchase a product that was from the heart of the Himalayan Mountains and had the properties associated with such a food.

78. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

79. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

80. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

81. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

82. Plaintiff relied on the representations and omissions that the Product was from the heart of the Himalayas and had a nutrient content associated with such a food.

83. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Breaches of Express Warranty,
Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

84. The Product was manufactured, identified, and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it was from the heart of the Himalayan Mountains and had the properties associated with such a food.

85. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

86. This duty is based on Defendant's outsized role in the market as a trusted retailer, only affixing its Kirkland Signature label to products that it independently confirms are consistent with their representations in all respects.

87. Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

88. Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices.

89. The Product did not conform to its affirmations of fact and promises due to defendant's actions and was not merchantable because it was not fit to pass in the trade as advertised.

90. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

91. Defendant had a duty to truthfully represent the Product, which it breached.

92. This duty is based on defendant's position, holding itself out as having special knowledge and experience this area, as custodian of the Kirkland Signature brand.

93. The representations took advantage of consumers' cognitive shortcuts made at the

point-of-sale and their trust in defendant, the leading grocer in the nation.

94. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

95. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

96. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was from the heart of the Himalayan Mountains and had the properties associated with such a food.

97. Defendant possesses specialized knowledge that the Product contained only added smoke flavoring, and was not smoked, yet sought to conceal or omit these facts, by failing to state on the front label a statement such as "Smoke Flavor Added" or "Not Smoked."

98. Moreover, the records Defendant is required to maintain provide it with actual and/or constructive knowledge of the falsity of the representations.

99. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

### Unjust Enrichment

100. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   October 10, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com

Law Office of James Chung
James Chung
43-22 216th St
Bayside NY 11361
Tel: (718) 461-8808
jchung_77@msn.com